Brookbank *v.* Benedum-Trees Oil Company, Appellant.

152

Argued March 18, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

reargument refused June 18, 1957.

*Elder W. Marshall* and *Charles E. Kenworthey,* with them, *Harvey A. Miller, Sr., Harvey A. Miller, Jr., B. R. Coppolo, Edwin W. Tompkins, J. Tomlinson Fort, John L. Rogers, Jr., Reed, Smith, Shaw & Mc-Clay, Driscoll, Gregory & Coppolo* and *Miller & Miller,* for appellants.

*William H. Eckert,* with him *Frank L. Seamans, Robert F. Patton, Clarence O. Devore* and *Smith, Buchanan, Ingersoll, Rodewald & Eckert,* for appellees.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, April 22, 1957:

This appeal presents an inquiry into the rights, if any, of a railroad company and its assignees to drill

for natural gas under an abandoned railroad bed which crosses a tract of land in Cameron County.

James H. Brookbank, one of two appellees,[1] is the owner of a 90 acre tract of land situated in Gibson Township, Cameron County, over a portion of which the Baltimore and Ohio Railroad Company operated a railroad until 1942.[2] The appellants are six corporations and two individuals, who claim an interest in a natural gas well drilled by or for them on or about April 1, 1953 on the former railroad bed crossing Brookbank's land, together with the corporation which purchases the gas recovered from the well.

Brookbank claims that the railroad company had simply a "right of way"[3] across his land for railroad purposes and, upon the cessation of its use for railroad purposes in 1942, the land within the "right of way" reverted to him as the present owner of the fee. The appellants claim that the railroad company in 1903 acquired by purchase from Brookbank's predecessors in title an estate in fee in the strip of land over which the railroad crossed which estate carried with it the right to the minerals, including gas, under the strip of land. The rights of the respective parties de-

---

[1] B. & M. Oil and Gas Co., the coappellee, is Brookbank's lessee.

[2] The Baltimore and Ohio Railroad Company acted as operating agent of the Buffalo and Susquehanna Railroad Co. into which the Susquehanna and Southern Railroad Company had been merged.

[3] "In New Mexico v. United States Trust Co. 172 U. S. 171, 181, 182, 43 L. ed. 407, 410, 411, 19 S. Ct. 128, the Court acknowledged that the term 'right of way' had two distinct meanings: (1) a 'mere right of passage;' and (2) ' "that strip of land which railroad companies take upon which to construct their roadbed." That is, the land itself—not a right of passage over it'." Mr. Justice FRANKFURTER's dissenting opinion in *United States of America, Petitioner v. Union Pacific Railroad Co.*, dated April 8, 1957, 353 U. S. 112, 1 L. Ed. 2d 693, 77 S. Ct. 685.

pend solely upon the interpretation of a written agreement dated January 7, 1903.

In 1902 one J. J. Ingraham and his wife owned this tract of land.[4] On August 14, 1902, the Susquehanna and Southern Railroad Company, acting through its board of directors, formally adopted a resolution which located a route for a railroad to be constructed from Sinnemahoning, Cameron County, to Sykesville, Jefferson County, an operative survey thereof having been completed. As located the proposed route crossed the Ingraham (now the Brookbank) farm. Subsequent thereto—January 7, 1903—the Ingrahams and the railroad company entered into the following written agreement:

"KNOW ALL MEN BY THESE PRESENTS, That J. J. Ingraham and Anna Ingraham parties of the first part, for and in consideration of the sum of Three hundred Dollars, lawful money of the United States, duly paid by the railroad company hereinafter mentioned, to us, receipt of which is hereby acknowledged, have granted, bargained, sold, released and conveyed unto the SUSQUEHANNA AND SOUTHERN RAILROAD COMPANY, a corporation organized under the laws of Pennsylvania, its successors and assigns, a strip of land four rods in width, and, through cuts and fills such additional widths as may be needed for slopes, one-half thereof on either side of the center line as now located, of the SUSQUEHANNA AND SOUTHERN RAILROAD, leading from Sinnemahoning, Pennsylvania, to DuBois, Sykesville, &c., through lands of the parties above mentioned, situate in Gibson Township, Cameron County, Pennsylvania.

---

[4] The Ingrahams were Brookbank's predecessors in title and the latter's right depends on the rights of the former.

"Together with the right to enter upon the said land and lay out, construct, maintain and operate a railroad over and across the lands belonging to the parties above mentioned, taking and using such earth, stones and gravel, as may be needed for grading and filling such road, and hereby fully releasing said railroad company, its successors and assigns, from all liability by reason of the location, construction and operation of the said railroad.

"A good farm crossing and cattle guard on each side thereof to be built and maintained by said Company.

"In Witness Whereof, the parties first above named hereunto set their hands and seals the Seventh day of January, 1903.

J. J. Ingraham       (Seal)
Anna Ingraham       (Seal)

State of Pennsylvania,   )
                    )   SS:
County of Cameron.     )

Personally appeared before the subscriber, a Justice of the Peace the above-named J. J. Ingraham and Anna Ingraham his wife who in due form of law acknowledged the foregoing release to be their act and deed and desired the same might be recorded as such,

Witness my hand and official seal this 7 day of January 1903.

B. Netey        J. P. (LS)"

Ingraham's rights under this instrument now belong to Brookbank and the railroad company's rights belong to the appellants with the exception of the corporation which simply purchases the gas as produced.

After this instrument was executed the railroad company built and operated a railroad which was lo-

cated on the route previously adopted to a width of four rods or 66 feet. Although the tracks and ties have not been removed from the roadbed, trains have not been operated thereon for approximately 14 years and the railroad has ceased actual operation. On the Brookbank farm and in close proximity thereto the railroad was constructed on a high embankment and through deep cuttings due to the nature of the terrain.

On January 3 and January 20, 1953, the appellees drilled two gas wells on the Brookbank farm both of which turned out to be successful. In April 1953, the appellants[5] drilled a gas well on the railroad bed and, although warned of appellees' rights, continued to drill successfully. The gas produced from appellants' well comes from the same underground reservoir as the gas from appellees' second well.

In an equity action instituted by appellees, the court below enjoined the appellants from removing any further gas, required them to account and make restitution for the gas previously taken and granted other equitable relief. From a final decree this appeal was taken.

We must determine what estate and interest, if any, the railroad company received under the written instrument of January 7, 1903 from the predecessors in title of Brookbank. Did this instrument convey to the railroad a fee simple title to the land or a base or conditional fee which upon abandonment of the land for railroad purposes would revert to the original owners or their successors in title? Upon the construction of this instrument depend the rights of the parties, and, in construing this instrument, our primary object must be to ascertain and effectuate what the

---

[5] The New York State Natural Gas Company purchases gas from the other defendants.

parties intended: *Hess et al., v. Jones,* 335 Pa. 569, 7 A. 2d 299.[6]

The instant agreement appears on a printed form. The handwritten[7] portions of the agreement set forth the name of the parties of the first part (Ingrahams), the amount of consideration, the name of the township and county, the clause providing for the erection and maintenance of a farm crossing and cattle guard on each side of the railroad,[8] the dates of execution

---

[6] In interpreting this instrument certain rules of construction are applicable: (1) the nature and quantity of the interest conveyed must be ascertained from the instrument itself and cannot be orally shown in the absence of fraud, accident or mistake and we seek to ascertain not what the parties may have intended by the language but what is the meaning of the words (*Teacher, Exrx. et al., v. Kijurina,* 365 Pa. 480, 486, 76 A. 2d 197; *Kimmel v Svonavec,* 369 Pa. 292, 295, 85 A. 2d 146; *Caldwell v. Fulton,* 31 Pa. 475); (2) effect must be given to *all* the language of the instrument and no part shall be rejected if it can be given a meaning (*Ivcy Co. v. Franklin Associates, Inc.,* 370 Pa. 225, 231, 232, 87 A. 2d 236; *Hardes v. Penn Charcoal & Chemical Co.,* 175 Pa. Superior Ct. 431, 436, 107 A. 2d 176); (3) if a doubt arises concerning the interpretation of the instrument it will be resolved against the party who prepared it (*Wiegand v. Wiegand,* 349 Pa. 517, 520, 37 A. 2d 492; *Commonwealth, to use, v. Horst Co. et al.,* 364 Pa. 403, 406, 72 A. 2d 131); (4) unless contrary to the plain meaning of the instrument, an interpretation given it by the parties themselves will be favored (*Monongahela Street Railway Co. v. Philadelphia Co. et al.,* 350 Pa. 603, 618, 619, 39 A. 2d 909; *Cirotti v. Wassell,* 163 Pa. Superior Ct. 292, 60 A. 2d 339); (5) "To ascertain the intention of the parties, the language of a deed should be interpreted in the light of the subject matter, the apparent object or purpose of the parties and the conditions existing when it was executed" (*Baederwood, Inc. v. Moyer,* 370 Pa. 35, 40, 41, 87 A. 2d 246; *Silverstein v. Hornick,* 376 Pa. 536, 103 A. 2d 734).

[7] The identity of the person or persons whose handwriting appears is undisclosed.

[8] In the absence of a statutory requirement the railroad was not bound to fence its tracks: *Penna. R. Co. v. Riblet,* 66 Pa. 164; *Fisher v. Penna. R. Co.,* 126 Pa. 293, 17 A. 607.

and acknowledgment, and the name and title of the acknowledging officer. All the rest of the agreement is printed. It is self-evident that the form was prepared by the railroad company for use in its various land transactions. This fact of preparation carries with it the burden of responsibility for the use of the words and phrases in the printed portion of the instrument.

Appellants predicate their conclusion that the parties intended by the instrument to convey a title in fee simple upon the following premises: (1) the so-called "operative words"—"granted, bargained, sold, released and conveyed"—employed to convey the land to the railroad, "its successors and assigns" were the ordinary and usual words used to convey a fee simple title; (2) the fact that the instrument conveyed a "strip of land" rather than a "right of way" was indicative of an intent to convey an estate in fee simple; (3) since the statute which conferred the right to acquire land by eminent domain limited the taking to 60 feet, the conveyance of a strip of land not to exceed four rods or 66 feet negatives the idea that this instrument had any connection with eminent domain procedure.

On the other hand, appellees predicate their conclusion that the parties intended to convey only a limited fee upon the following premises: (1) that the small amount of consideration paid indicates a limited estate was intended; (2) the fact that the "operative words" were used in the past, not in the present tense, indicates that the instrument was not conveying any title but rather such language made reference to the steps already taken in the eminent domain procedure by which a taking of the land had been effected; (3) the words "as now located" in the description of the subject matter of the instrument referred to the prior taking by location of the route of the railroad; (4) the

omission of any habendum, tenendum and warranty clauses negatives the idea that a fee simple title was being conveyed; (5) the grant in the second paragraph of the instrument of certain rights to the railroad as well as a release from liability are inconsistent with the conveyance of a fee simple title; (6) the printed words "foregoing release" in the acknowledgment clause clearly indicated what the parties intended the character of the instrument to be; (7) the language of the instrument is entirely consistent with the construction that it was intended as a release of damages and payment of compensation to effect a taking of this land by eminent domain.

A circumstance which can be a factor in the determination of the question of the quantum of the estate intended to be conveyed is the amount of consideration shown to have been paid by the railroad: *New York, B. & E. R. Co. v. Motil,* 81 Conn. 466, 71 A. 563; *Battelle v. New York, N. H., & H. R. R. Co.,* 211 Mass, 442, 97 N. E. 1004; *Rogers v. Pitchford,* 181 Ga. 845, 184 S.E. 623. Appellees contend that the consideration— $300—shown herein is inadequate for the passage of a fee simple title. However, in the absence of any evidence as to value of this strip of land in 1903, a finding that the consideration was inadequate for conveyance of a fee simple title would be based on conjecture and surmise. On this record the stated consideration is not reflective of the parties' intent.

The instrument recites that the Ingrahams "have granted, bargained, sold, released and conveyed" a strip of land "unto the SUSQUEHANNA AND SOUTHERN RAILROAD . . . its successors and assigns". Appellants urge that by the use of this language the parties clearly intended to convey a fee, the words granted, bargained, etc., being in the "classic form of a Pennsylvania conveyance of a title in fee", as approved by the

160

textwriters[9] of that day as well as by statute.[10] The statute however does not provide that these words shall have the effect of conveying a fee but rather that if a grantor employs such words he covenants that he is seized of an indefeasible estate in fee simple and that he has done no act nor created any incumbrance whereby the estate granted may be defeated. (*Dorsey v. Jackman,* 1 S. & R. 42; *Knepper v. Kurtz,* 58 Pa. 480; *Little v. Thropp,* 245 Pa. 539, 91 A. 924; *Grange Trust Co. v. Shade et al.,* 102 Pa. Superior Ct. 122, 156 A. 620); it is a certification of the quantum and quality of the grantors' estate, not that which is being conveyed. Neither the textbooks nor the decisions substantiate the appellants' position in this respect.[11] The words grant, bargain, etc., must be interpreted in the light of the entire instrument, particularly since these words are used in the past, rather than the present tense.[12] These words, used in the past tense, do not, standing alone, compel an interpretation that a fee was intended to be conveyed. Even the strongest words of present conveyance to a grantee, *his heirs and assigns,* or *successors and assigns,* do not always convey an es-

[9] Mitchell, "Real Estate and Conveyancing in Pennsylvania" (1890 ed.), chapters XI, XII, pp. 402-432; Fallon, "Pennsylvania Law of Conveyance" (1920 ed.), p. 152.

[10] Act of May 28, 1715, 1 Sm. L. 94, 21 PS §8. Obviously the Act of 1909, P. L. 91, 21 PS §2 is inapplicable.

[11] *Grey v. Packer,* 4 W. & S. 17; *Williams v. Bentley et al.,* 27 Pa. 294; *Stewart's Admrs. v. Lang,* 37 Pa. 201; *Davis v. Martin,* 8 Pa. Superior Ct. 133. In *Kreider v. Lafferty,* 1 Whart. 302, 315, the words "grant" and "convey" were held inexpressive of the quantum of the estate conveyed and used simply for the purpose of passing from the seller to the purchaser the estate therein described.

[12] These words are indicative that an estate *had been* granted and conveyed rather than that an estate was *being* conveyed.

tate in fee simple,[13] if other parts of the agreement show that this was not the intention of the parties.

The subject matter of the conveyance was "a strip of land four rods in width . . . one-half thereof on either side of the center line as now located of the . . . RAILROAD." The appellants and appellees each find comfort in certain portions of this language. Appellants contend that courts in other jurisdictions have held that when an instrument purports to convey land or a "strip of land" to a railroad the latter obtains a fee simple title in the absence of any expressed contrary intent.[14] It is true that in other jurisdictions a judicial "yardstick" has been established by the application of which conveyances to railroads granting or conveying a strip, parcel or tract of land are held to pass a fee simple title whereas conveyances which grant or convey a "right" are held to pass only a limited estate. However, this "yardstick" is only applied in the absence of additional language cutting down or limiting, directly or indirectly, the estate conveyed, and is only applicable in this case as *one* of the factors to be considered in attempting to determine the parties' intent.[15] Appellees argue that the phrase "as now located" refers to the fact that the railroad route had already been located by a survey on the basis of which the route had been established by appropriate corporate action of the railroad, thus lending strength to appellees' argument that this agreement constituted the

---

[13] *Williams v. Bentley*, supra; *Dreisbach v. Serfass et al.*, 126 Pa. 32, 33; *Phillips et al. v. Swank*, 120 Pa. 76, 84.

[14] *Midland Valley R. R. Co. v. Arrow Industrial Manufacturing Co.*, Okla. , 297 P. 2d 410; *Quinn v. Pere Marquette R. R. Co.*, 256 Mich. 143, 239 N. W. 376; *Keen et al. v. Cleveland C. C., & St. Louis Rwy Co. et al.*, 392 Ill. 362, 64 N. E. 2d 499; *Boeche v. Wagner*, 206 Ore. 621, 293 P. 2d 203.

[15] See excellent note on this subject in 132 A. L. R., 142 et seq.

last step in the eminent domain procedure. A reading of this phrase, describing the subject of the conveyance, in its entirety, indicates that the railroad was acquiring some undefined rights in a strip of land which was 66 feet in width, 33 feet of which lay on either side of the center line of the railroad as established by some prior act of location. The reference to a prior act of location does add weight to the position of appellees and the description "a strip of land" aids appellants.

Appellants also urge that the fact that the strip of land conveyed was 66 feet in width negatives the idea that the agreement was the last step in eminent domain procedure.[16] The appropriate statute under which a railroad could acquire land by eminent domain limited the taking of land to 60 feet in width "except in the neighborhood of deep cuttings, or high embankments . . . ." The court below found that the evidence showed "that the nature of the terrain . . . was of such a nature as to require a strip more than sixty feet in width", a finding that the statutory exception applied in this instance.[17]

Bearing on the character of this instrument is the omission of habendum, tenendum and warranty clauses. If the railroad intended to receive a fee, is it likely that it would not have required of Ingrahams a warranty of their title? If the railroad intended to receive a fee, is it likely that a habendum clause—descriptive

---

[16] *Clay v. Missouri State Highway Commission*, 362 Mo. 60, 239 S. W. 2d 505, held that the fact that a railroad acquired a wider strip than permitted in condemnation indicated a fee simple title in the railroad.

[17] Such a finding of fact is entitled to the weight of a jury's verdict and where supported by evidence and affirmed by the court en banc is controlling in the appellate court: *Oreovecz v. Merics*, 382 Pa. 56, 114 A. 2d 126.

of the extent of the estate conveyed—would have been omitted? It seems inconceivable that the railroad would have omitted these clauses from an instrument of conveyance under whose terms they intended to receive a fee simple estate.

The language of the second paragraph spells out specifically certain rights given to the railroad and also a release running from the landowner relieving the railroad of certain possible liabilities. The railroad is given the "right to enter upon the said land, and lay out, construct, maintain and operate a railroad over and across the land . . . taking and using such earth, stones and gravel, as may be needed for grading and filling such road". The rights thus granted—the right of entry, the right to use, construct, maintain and operate a railroad, the right to use earth, stones and gravel to grade and fill the roadbed—are all rights which naturally and lawfully arise from ownership of land in fee simple.[18] If the parties intended the railroad to receive a fee in this land, this language would give it those rights which it already had. If the parties intended to convey a fee simple interest to the railroad, it was surplusage to give the railroad these rights because such rights would naturally belong to the railroad as holder of the fee. The only rational conclusion from this language is that the parties did not intend to vest in the railroad any interest in fee simple; any other construction does violence to the expressed grant of these rights to the railroad.

The landowner further releases the railroad from any liability arising from the location, construction and operation of the railroad. If the railroad were

---

[18] When a railroad obtains a "right of way" it has the right to use all the suitable materials, except timber, within the lines of its way for the construction and maintenance of its road: *Hall et al. v. D. L. & W. R. Co.*, 270 Pa. 468, 113 A. 669; *Lyon v. Gormley, etc.*, 53 Pa. 261.

given under this instrument a fee interest in this land the railroad would have a complete right to locate, construct and operate a railroad over the land. The only situation where any liability might accrue to the railroad from the location, construction and operation over this land would be in the event the railroad secured simply a "right of way" over the land.

To effect a more complete understanding of the intent of the parties by the use of this language reference must be had to the factual background and the circumstances leading up to the execution of this agreement. In 1902 the railroad company had had a survey made of a proposed route from a point in Cameron County to a point in Jefferson County. Upon completion of this survey the railroad company, by appropriate corporate action, approved and adopted this surveyed route. It is appellees' position that these two steps were taken by the railroad company to acquire this land by eminent domain. The acquisition of land by the latter method provides three steps: (1) a survey of the route; (2) adoption of the route by resolution of the board of directors of the railroad company[19] and (3) payment of compensation to the landowner.[20] The railroad had already accomplished the first two steps. Was this instrument the accomplishment of the third step by providing compensation to the landowner and a release of the railroad company or was it an acquisition of the land by purchase?[21]

---

[19] *Snyder v. B. & O. R. R. Co.*, 210 Pa. 500, 60 A. 151; *Wilson v. Pittsburg & Lake Erie R. Co.*, 222 Pa. 541, 72 A. 235; *Scranton Gas & Water Co. v. D. L. & W. R. Co.*, 225 Pa. 152, 73 A. 1097.

[20] Act of February 19, 1849, P. L. 79, 67 PS §271. See: *Templeton v. L. & W-B Coal Co.*, 50 Pa. Superior Ct. 341, 346, 347, 348.

[21] An effort to agree is an essential prerequisite to the institution of condemnation proceedings under the statute: *O'Hara v. Pennsylvania R. R. Co.*, 25 Pa. 445; *Pennsylvania & New York R. R. & Canal Co. v. Bunnell*, 81 Pa. 414; *Darlington v. U. S.*, 82 Pa. 382.

At the time this instrument was executed the railroad company had already acquired a servitude on the land so that any third party acquiring an interest therein would take subject to the rights of the railroad company: *Williamsport, etc. R. Co. v. Phila., etc. R. Co.,* 141 Pa. 407, 21 A. 645; *Johnston v. Callery,* 184 Pa. 146, 39 A. 73. However, title had not yet passed to the railroad company and would not pass until the compensation had been paid to the landowner: *Underwood v. Pennsylvania M. & S. R. Co.,* 255 Pa. 553, 99 A. 64; *Ferguson v. Pittsburgh & Shawmut R. Co.,* 253 Pa. 581.

The second paragraph of the agreement particularly as it refers to a prior location of the railroad and grants rights inconsistent with an alleged prior grant of a fee negatives any intent to grant the railroad a fee.

The acknowledgment clause is very significant. The Ingrahams acknowledged the instrument as the *"foregoing release"*. In construing this clause we must bear in mind that the instrument was on a printed form prepared by the railroad company, that the word "release" was printed and the use of this form was a considered act on the part of the railroad. The fact that Ingrahams designated the instrument as a "release" for the purpose clearly indicates that the parties intended that the instrument be a release, not a deed.[22]

An examination of this agreement in its entirety, including all its language, convinces us that the par-

---

[22] A "release" at common law was a form of conveyance but it was conveyance by the owner of a future interest to the holder of the present estate: Nicholson, "Pennsylvania Law of Real Estate" (1929 ed.), 213; Thompson, "Title to Real Property" (1919 ed.), 328.

ties did not intend the conveyance of a fee. This construction does not cut down a fee previously granted because there was no prior grant of a fee. Cf: *Schultz v. Grove*, 70 Pa. Superior Ct. 494. This agreement simply constituted the final step in the acquisition of this strip of land by eminent domain. The language of the agreement is subject to interpretation only in this light. All that the railroad acquired was a "right of way" for railroad purposes.[23]

In reaching this conclusion we have not taken into consideration the parol evidence concerning the caption on this agreement, other agreements of the railroad and

---

[23] The interest acquired by a railroad was unknown to the common law. This comparatively new interest in land is without a technical legal name. Some of the early cases refer to it as an easement, while later cases call it a base or conditional fee: *Pa. Schuylkill Val. R. R. v. Reading Paper Mills*, 149 Pa. 18, 24 A. 205; *Pittsburgh, Ft. Wayne & Chicago Ry. v. Peet*, 152 Pa. 488, 490; *Dilts v. Plumville R. Co.*, 222 Pa. 516, 528; *Lazarus v. Morris*, 212 Pa. 128, 131, 61 A. 815; *Citizens Elec. Co. v. Susquehanna Boom Co.*, 270 Pa. 517, 522, 523, 113 A. 559. Mr. Justice SIMPSON pertinently said in *Hall et al. v. Delaware, Lackawanna & Western Railroad Co.*, 270 Pa. 468, 471, 113 A. 669: "The vital thing, however, is not the name given to the estate acquired by the railroad company . . . but what are the rights acquired by reason of the taking?" The interest which the railroad acquires does not include the subsoil for the title to the minerals remains in the landowner (*Lyon v. Gormley, etc.*, supra; *Laurence and Others' Appeal*, 78 Pa. 365; *Rice v. Clear Spring Coal Co.*, 186 Pa. 49, 61, 40 A. 149; *Hall et al. v. Delaware, Lackawanna & Western Railroad Co.*, supra), water in a spring within the right of way (*Dilts v. Plumville R. Co.*, supra; *Cambria and Clearfield Ry. Co. v. Water Co.*, 226 Pa. 402, 75 A. 595), the right to grant to a telephone company the right to erect poles and wires on the right of way for the telephone company's purposes (*Pittock v. Central District & Printing Telegraph Co.*, 31 Pa. Superior Ct. 589) nor the right to sell gravel, etc., excavated from the right of way which is not needed for railroad purposes (*Lyon v. Gormley*, supra; *Hall et al. v. Railroad Co.*, supra).

Ingrahams, etc., because the written agreement itself admits of no ambiguity concerning the intent of the parties.

The railroad received simply a right to the surface and so much beneath as was necessary for the support of the railroad and its roadbed: *Pa. Schuylkill Val. R. R. v. Reading Paper Mills,* 149 Pa. 18, 20, 21. Under this instrument the railroad received simply a base or conditional fee for railroad purposes which was acquired by eminent domain procedure of which the writing evidenced the final step. This was not an absolute, but a defeasible fee and it carried with it the right to the use of the surface and so much of the subsurface as was necessary to support the roadbed, but no mineral rights: *Lyon v. Gormley,* supra. When the strip of land ceased to be used for the purpose acquired, the rights of the railroad ceased and reverted to the owner of the fee. When this well was drilled the appellants, taking through the railroad company, were without any right of ownership and their acts were those of trespassers.

Appellants, in addition to the question raised concerning the agreement of 1903, also questioned the order of the court below in two other respects: (1) the validity of its finding that the actions of appellant railroads in drilling the well were ultra vires and (2) the validity of the court's action in impounding all monies received for the gas until after the depletion of the well and opportunity had to determine, by a survey, whether appellants' well had drifted into an area concededly owned by appellees. In view of our conclusion that appellants' rights had ceased to exist in this strip of land, it is unnecessary to pass on the other questions which appellants raised.

Since appellees established their ownership in the land wherein appellants operated their gas well the decree of the court below was properly entered.

The decree of the court below is affirmed. Costs are to be paid by appellants.

Mr. Justice Musmanno dissents.